

**IT IS ORDERED as set forth below:**

**Date: July 5, 2019**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE: | |
| THINK RETAIL SOLUTIONS, LLC, | CASE NO. 15-56153-BEM |
| Debtor. | CHAPTER 7 |
| ROBERT TRAUNER, as Plaintiff for the Estate of Think Retail Solutions, LLC Under Chapter 7 of the Bankruptcy Code; and as applicable as Plaintiff for the Estate of Tammy P. Simpson Under Chapter 7 of the Bankruptcy Code, | |
| Plaintiff, | ADVERSARY PROCEEDING NO. 17-5078-BEM |
| v. | |
| DELTA AIR LINES, INC., | |
| Defendant. | |

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

On March 30, 2017, Robert Trauner ("Plaintiff") filed a complaint (the

"Complaint" or "Comp.") against Delta Air Lines, Inc. ("Defendant") for recovery of fraudulent

transfers and unjust enrichment. [Doc. 1]. Plaintiff filed the Complaint in his capacity as Chapter 7 Trustee for the separate bankruptcy estates of Think Retail Solutions, LLC ("TRS") and its principal Tammy P. Simpson ("Simpson" and with TRS, the "Debtors"). Defendant filed an answer on May 30, 2017 (the "Answer" or "Ans."). [Doc. 6]. The Complaint consists of five counts: (1) recovery for the benefit of TRS's estate pursuant 11 U.S.C. §§ 544, 550 and O.C.G.A. § 18-2-74, -75 of fraudulent transfers made by TRS; (2) alternatively to Count 1, recovery for the benefit of Simpson's estate pursuant to 11 U.S.C. §§ 544, 550 and O.C.G.A. § 18-2-74, -75 of fraudulent transfers made by Simpson; (3) recovery for the benefit of TRS's estate pursuant 11 U.S.C. §§ 548 and 550 of fraudulent transfers made by TRS; (4) alternatively to Count 3, recovery for the benefit of Simpson's estate pursuant to 11 U.S.C. §§ 548 and 550 of fraudulent transfers made by Simpson; and (5) liability for unjust enrichment.

The transfers at issue are the purchase of airline tickets from Defendant for Simpson, her friends and family for both personal and business travel. The Complaint seeks to avoid transfers in the total amount of $181,336.63. Plaintiff filed a *Motion for Partial Summary Judgment* seeking summary judgment with respect to some of the alleged fraudulent transfers in the amount of $90,656.38, such transfers being for tickets to locations where Simpson engaged in gambling activities or to other locations that had no business purpose for TRS or Simpson ("Plaintiff's Motion"). [Docs. 70, 76, 102 ¶ 3]. Defendant filed a *Motion for Summary Judgment* seeking summary judgment on all counts of the Complaint and as to all transfers ("Defendant's Motion" and with Plaintiff's Motion, the "Motions"). [Doc. 77].

2

## I. Jurisdiction and Parties

The Court has jurisdiction in this proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O). The parties consent to entry of final orders and judgments by the Bankruptcy Court on the cross motions for summary judgment. [Comp. ¶ 14; Doc. 89-2 ¶ 11].

As an initial matter, the question arises whether Plaintiff can pursue claims against Defendant for the benefit of Simpson's bankruptcy estate in this proceeding when the bankruptcy estates of TRS and Simpson are neither jointly administered nor consolidated. Plaintiff argues that he can pursue claims as trustee for Simpson's estate[1] and on behalf of her creditors in this proceeding and to hold otherwise would be impractical and inefficient because it would require Plaintiff to file an adversary proceeding before a different judge.

At a hearing held on November 1, 2018, Plaintiff argued that permissive joinder would allow joinder of the trustees of both estates as plaintiffs. Defendant argues that Plaintiff cannot bring claims to benefit Simpson's estate without joint administration or consolidation of the two cases because Simpson, as the sole member of TRS, is separate from TRS and likewise the bankruptcy estates are separate. Defendant argues further that Plaintiff, as trustee for Simpson's bankruptcy estate, is barred from bringing claims by the statute of limitations of 11 U.S.C. § 546.

Defendant relies on *Spradlin v. Beads & Steeds Inns, LLC* (*In re Howland*), 579 B.R. 411 (E.D. Ky. 2016), to argue that Plaintiff cannot bring claims on behalf of Simpson's estate in TRS's case because the estates of the entity and principal have not been consolidated. The facts in *Howland* are easily distinguished from the facts in this proceeding. In *Howland*, the trustee sought to avoid a transfer of property by a non-debtor LLC whose principals were

---

[1] As noted previously, the Complaint contains four counts to avoid alleged fraudulent transfers and, in two counts, pleads in the alternative to recover transfers on behalf of Simpson's estate rather than TRS's estate.

debtors. *Id.* at 415. The court noted that an LLC and its principals are separate entities such that a transfer by the non-debtor could not be avoided in the debtor's case. *Id.* at 415-16. Here, both TRS and Simpson are debtors, albeit in separate cases assigned to different bankruptcy judges and Plaintiff is the chapter 7 trustee in each of the separate cases.

The Federal Rules of Civil Procedure allow for permissive joinder of parties as plaintiffs if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and ... any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1)(A) and (B); Fed. R. Bankr. P. 7020. In the Eleventh Circuit the test for determining the same transaction or occurrence is whether the claims arise out of the same operative facts. 3 Moore's Federal Practice – Civil § 13.10 (citing *Republic Health Corp. v. Lifemark Hosps.* 755 F.2d 1453, 1455 (11th Cir. 1985) (in the context of compulsory counterclaims[2])).

The Supreme Court has stated that, "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1138 (1966). Although the parameters established in *Gibbs* are broad, those parameters are limited by the Supreme Court's statement that the word "transaction" has flexible meaning and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their *logical relationship*." *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S. Ct. 367, 371 (1926) (emphasis added). "There are no hard rules for determining what constitutes a single transaction or a series of transactions, but a logical relationship between the existing defendants

---

[2] "In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts have looked for meaning to Fed. R. Civ. P. 13(a) governing compulsory counterclaims." *Alexander v. Fulton Cty.*, 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).

and the proposed defendants can satisfy this requirement." *High-Top Holdings, Inc. v. RREF II BB Acquisitions, LLC (In re High-Top Holdings, Inc.)*, No. 16-10022, AP 16-1008, 2016 WL 4411278, at *2 (Bankr. N.D. Ga. July 18, 2016) (Drake, J.) (quoting *Titan Fin. Group II, LLC v. Delta Family P'ships, L.P. (In re Titan Fin. Group II, LLC)*, No. 06-70852, AP 06-6400, 2009 WL 6499335, at *2 (Bankr. N.D. Ga. Feb. 2, 2009) (Diehl, J.) (discussing joinder of defendants, but the Rule for plaintiffs and defendants is identical)). "The logical relation test is a loose standard which permits a 'broad realistic interpretation in the interest of avoiding a multiplicity of suits.'" *Plan v. Blazer Fin. Servs., Inc. of Ga.*, 598 F.2d 1357, 1361 (5th Cir. 1979) (quoting 3 Moore's Federal Practice ¶ 13.13 (1972)).[3]

Although each of the payments at issue in this proceeding is in a different amount and was made on a different date, the underlying facts relating to the subject matter of the payments, manner of payment, and how the tickets were used is the same for each payment. In addition, questions of fact and law raised in each of TRS's and Simpson's cases are the same with respect to whether the transfers were fraudulent or constructively fraudulent, what value was given and received, and all actions were taken by Simpson either in her individual capacity or through TRS. Further, in two of the four fraudulent conveyance counts, Plaintiff initially seeks recovery on behalf of TRS's estate for all transfers and pleads recovery on behalf of Simpson's estate only in the alternative. Thus, the Court concludes that permissive joinder of the trustees of the two bankruptcy estates as plaintiffs is appropriate[4] and does not provide a basis to grant summary judgment to Defendant with regard to transfers by Simpson.

---

[3] Opinions of the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[4] Although the Court has determined that joinder meets the standards of the Federal Rules of Civil Procedure and is not a basis to grant Defendant's motion for summary judgment, Plaintiff's response speaks to the underlying purpose of the joinder rules, but fails to articulate an argument in support of this procedure or even acknowledge such a procedure, which implicates concerns over judge shopping. Joinder would have been better pursued by

In its argument on this issue, Defendant argues the statute of limitations has run under 11 U.S.C. § 546 with respect to Simpson's estate, i.e., the claims of Simpson's estate cannot be brought in this proceeding, and the time has run to file such claims in the Simpson case. However, because the Court finds that joinder is appropriate, Defendant's statute of limitations argument fails. Section 546 requires that a trustee file a cause of action under § 548 no later than the earlier of (i) two years after the petition date[5] or the date the case is closed or dismissed.  Here, Simpson's case was filed on April 3, 2015. [Pl. SMF ¶ 3, n.4; Def. Resp. ¶ 3].[6] Plaintiff filed this proceeding on March 30, 2017. [Pl. SMF ¶ 6; Def. Resp. ¶ 6]. Thus, Plaintiff filed this proceeding within two years of Simpson's petition date and the action is not barred by § 546.

## II. Summary Judgment Standard

The parties have presented cross motions for summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056(c). The Court will only grant summary judgment when the evidence, viewed in the light most favorable to the nonmoving party shows no genuine dispute of material fact. *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986). A fact is material if it "might affect the outcome of the suit under the governing law …." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute of material fact is genuine "if the

---

Plaintiff with a motion at the beginning of the proceeding rather than argument mid-stream because of the additional transparency that would have been provided to creditors of each Debtor.
[5] Section 546 sets the deadline as the later of two years after the petition date or one year after appointment or election of a trustee, which would be earlier in this case and thus not applicable.
[6] *See infra* n. 7.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*
"[T]he court may consider any admissible facts and disregard any inadmissible statements
occurring in the same affidavit." *Devan v. Zamoiski Southeast, Inc. (In re Merry Go Round
Enter., Inc.)*, 272 B.R. 140, 145 (Bankr. D. Md. 2000); *see also Peterson v. Board of Trustees of
the Univ. of Ala.*, 644 F. App'x 951, 954 (11th Cir. 2016).

The moving party has the burden of establishing its entitlement to summary
judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party
must identify the pleadings, discovery materials, or affidavits that show the absence of a genuine
issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once this burden is met, the
nonmoving party cannot merely rely on allegations or denials in its own pleadings. *Hairston v.
Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). Rather, the nonmoving party must
present specific facts supported by evidence that demonstrate there is a genuine material dispute.
*Id.* When the material facts are not in dispute, the role of the Court is to determine whether the
law supports a judgment in favor of the moving party. *Anderson*, 477 U.S. at 250, 106 S. Ct. at
2511.

When the moving party has the burden of proof at trial, that party must
affirmatively show the absence of a genuine issue of material fact: it must support its motion
"with credible evidence … that would entitle it to a directed verdict if not controverted at trial."
*Celotex*, 477 U.S. at 331, 106 S. Ct. at 2557. Upon making this showing, the burden shifts to the
nonmoving party, who must produce "significant probative evidence demonstrating the existence
of a triable issue of fact" to avoid summary judgment. *American Viking Contractors, Inc. v.
Scribner Equip. Co., Inc.*, 745 F.2d 1365, 1369 (11th Cir. 1984). When considering summary

judgment, the Court "'must not resolve factual disputes by weighing conflicting evidence.'" *Tippens*, 805 F.2d at 953 (quoting *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986)).

The standard for granting summary judgment is not affected by the filing of cross-motions for summary judgment. "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A C. Wright, A. Miller & M. Cane, Fed. Prac. & Proc., § 2720 at 335-36 (4th ed. Apr. 2019 update).

With respect to Plaintiff's Motion, Plaintiff has the burden of proof at trial to establish each of the elements of his claims by a preponderance of the evidence under either §§ 544 or 548(a). *Howell v. Fulford (In re Southern Home and Ranch Supply, Inc.)*, 515 B.R. 699, 704 (Bankr. N.D. Ga. 2014) (Drake, J.) (citations omitted). With respect to Defendant's Motion, Defendant must prove that Plaintiff cannot make out a prima facie case for the fraudulent transfer and unjust enrichment claims or that Defendant has a defense to either avoidance or recovery of the transfers.

## III. Factual and Evidentiary Disputes

Both parties filed statements of undisputed material facts with their motions, and both filed responses to the moving's party's statement of facts.[7] [Docs. 74, 77-1, 89-2, 90-2]. In addition, the parties filed a stipulation resolving some factual disputes. [Doc. 102]. In summary, Simpson was the sole member and manager of TRS, a company that produced point of purchase

---

[7] Plaintiff's *Statement of Material Facts as to Which No Genuine Issues Exists to Be Tried in Support of Motion for Partial Summary Judgment* [Doc. 74]. will be referred to as "Plaintiff's SMF" or "Pl. SMF." Defendant's *Statement of Undisputed Facts in Support of Its Motion for Summary Judgment* [Doc. 77-1] will be referred to as "Defendant's SMF" or "Def. SMF." Plaintiff's *Response to Delta Air Lines, Inc.'s Statement of Undisputed Facts in Support of Its Motion for Summary Judgment* [Doc. 90-2] will be referred to as "Plaintiff's Response" or "Pl. Resp." Defendant's *Response to Plaintiff's Statement of Material Facts as to Which No Genuine Issue Exists to Be Tried in Support of Motion for Partial Summary Judgment* [Doc. 89-2] will be referred to as "Defendant's Response" or "Def. Resp." The *Joint Stipulation of Plaintiff and Defendant Resolving Certain Disputes of Fact in Connection With Pending Summary Judgment Motions* [Doc. 102] will be referred to as the "Stipulation" or "Stip."

advertising materials. Defendant is an U.S.-based airline. Between 2011 and 2014 Simpson purchased or caused TRS to purchase more than $180,000 worth of airline tickets from Defendant. Tickets costing approximately $90,000 were purchased for the personal use of Simpson and others, including gambling trips, rather than for business purposes on behalf of TRS. The tickets were purchased using TRS's debit card, Simpson's debit card, and two credit cards issued to Simpson that were paid by TRS. Plaintiff seeks to recover those payments from Defendant.

Defendant raised repeated objections to the materiality and conciseness of Plaintiff's SMF and legal conclusions contained therein, and objected to Plaintiff's frequent reference to Simpson's gambling as a compulsion, addiction, or psychological disorder. Plaintiff objected to certain statements in affidavits submitted by Defendant. The Court held oral arguments on the Motions on November 1, 2018, at which time counsel for the parties clarified the scope of factual disputes. At the November Hearing, counsel for Defendant explained that many of Defendant's objections were to the relevance and materiality of the distinction made by Plaintiff between business and personal trips.

The Court agrees with Defendant that Plaintiff's SMF includes legal conclusions, arguments, and lengthy, pages-long statements, and will disregard any non-factual content in both parties' SMFs and Responses thereto for purposes of determining the undisputed material facts.

With respect to Simpson's gambling activity, Plaintiff sets forth excerpts from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM") on "Gambling Disorder," extensive quotations from Simpson's deposition in which Simpson indicates that she was "addicted" to gambling, and specifics as to dollar amounts Simpson received from TRS and

used on gambling and gambling-related activities. [Pl. SMF ¶ 14-16, 18-21]. Defendant objects to Plaintiff's characterization derived from deposition testimony of Simpson, who is not an expert, as a compulsive gambler and objects to Plaintiff's SMFs that attempt to show that Simpson's conduct fits within the DSM for compulsive gambling. The Court agrees that neither Simpson nor Plaintiff's counsel are qualified to diagnose a medical condition and sustains Defendant's objection to Plaintiff's characterization of Simpson's gambling activity. *See Mack v. Metropolitan Life Ins. Co.,* 246 F. App'x 594, 598 (11th Cir. 2007); Pl. SMF ¶¶ 14, 15, 16, 20. It appears undisputed that Simpson gambled and in so doing used a significant amount of money. Beyond that, as just explained, the Court agrees with Defendant that the exact characterization and amount of the gambling is irrelevant to the issues that the Court must decide. With this in mind, the Court will not consider the characterization of Simpson's gambling nor will the Court consider Plaintiff's SMF ¶¶ 46-51, 57-60 and the portions of ¶¶ 61-66 that contain legal conclusions and arguments.

With respect to the personal use of the airline tickets, because Defendant's objection is related to how value is to be determined, this is a legal issue rather than a factual dispute–as it does not appear that the parties dispute that Simpson used the tickets at issue in the Plaintiff's Motion for personal trips for herself, her friends, and her family.[8] Thus, the Court will address the materiality objection regarding personal use in conjunction with the analysis of value necessary to determine whether Plaintiff or Defendant is entitled to a finding of value or lack of value.

Additionally, ¶ 22 of Plaintiff's SMF sets forth the payments to Defendant upon which Plaintiff seeks entry of judgment at this time with the total being $90,656.38 [Doc 74,

---

[8] In contrast, Defendant's Motion addresses all transfers raised in the Complaint, including tickets used for business purposes.

102]. The parties dispute whether Defendant is the initial transferee of these payments, but it does not appear that the parties dispute that each of the payments was made either by use of a TRS debit card or Simpson's debit or credit cards with the credit card statements being paid directly by TRS and the debit card amounts being withdrawn from each of TRS's and Simpson's bank accounts. That being the case, the Court concludes that the facts that the payments set forth at Plaintiff's SMF ¶ 22(a) through (d) as corrected by the Stipulation were made and the amount of each of the payments is not disputed.

Finally, the parties dispute whether TRS was generally paying its debts as they came due and was solvent. [Pl. SMF ¶ 38–45]. The parties agreed to a consent order staying expert discovery until after this Court rules on the Motions. [Doc. 67]. Defendant states that, for purposes of the Motions, it will concede insolvency, but reserves its rights to contest insolvency at trial if a trial is necessary. [Def. Resp. ¶ 38]. That being the case, for purposes of ruling on the Motions, the Court assumes insolvency and will disregard the statements in Plaintiff's SMF regarding the same.

Plaintiff filed a list of *Evidentiary Objections to Defendant Delta's Summary Judgment Record*. [Doc. 91]. In the pleading, Plaintiff asks the Court to strike certain statements in the affidavits of Paulette Henderson [Doc. 79] and Mark Manhan [Doc. 78] as not being based on personal knowledge, not consistent with the documentary evidence, or being impermissible legal opinion. These objections were also raised in Plaintiff's Response. For purposes of the Motions, the Court will treat the statements identified by Plaintiff as disputed.

**IV. Undisputed Facts**

TRS filed a Chapter 7 petition on April 3, 2015, thereby commencing case no. 15-56153. [Comp. ¶ 1; Ans. ¶ 1; Pl. SMF ¶ 1; Def. Resp. ¶ 1]. Simpson also filed a Chapter 7

petition on April 3, 2015, thereby commencing case no. 15-56155. [Comp. ¶ 3; Ans. ¶ 3; Pl. SMF ¶ 3; Def. Resp. ¶ 3]. Plaintiff is the trustee in both cases. [Comp. ¶ 2, 4; Ans. ¶ 2, 4 Pl. SMF ¶ 2, 4; Def. Resp. ¶ 2, 4]. Simpson, as the sole owner and member of TRS, authorized the filing of TRS's bankruptcy case. [Pl. SMF ¶ 5; Def. Resp. ¶ 5]. Plaintiff initiated this adversary proceeding on March 30, 2017. [Pl. SMF ¶ 6; Def. Resp. ¶ 6].

TRS was organized as a Georgia limited liability company on or about March 26, 2008. [Pl. SMF ¶ 33; Def. Resp. ¶ 33]. Prior to bankruptcy, TRS specialized in the design, production, and fulfillment of both temporary and permanent point of purchase advertising materials and created and produced dynamic signage displays and fixtures. [Pl. SMF ¶ 35; Def. Resp. ¶ 35]. TRS was the largest contract supplier to AT&T, which in turn was TRS's primary customer. [Pl. SMF ¶ 36; Def. Resp. ¶ 36; Def. SMF ¶ 49; Pl. Resp. ¶ 1]. TRS provided AT&T with services including in-store merchandising programs, printing large-format banners, and providing permanent displays and fixtures for the stores. [Pl. SMF ¶ 36; Def. Resp. ¶ 36]. TRS was AT&T's "go to," and Simpson was the person AT&T came to for creative ideas. [Id.] In addition to AT&T, TRS's customers included Freshens and Cox Communications. [Def. SMF ¶ 44; Pl. Resp. ¶ 1].

Simpson has been the sole member, president, and sole manager of TRS since its organization. [Pl. SMF ¶ 34; Def. Resp. ¶ 34; Def. SMF ¶ 47; Pl. Resp. ¶ 1]. As such, Simpson's duties included but were not limited to managing existing customer relationships, marketing TRS to potential new customers, serving as the lead designer and creative strategist, supervising employees and contract staff, and generally overseeing the operations of TRS, including the maintenance of TRS's books and records and the filing of TRS's tax returns. [Def. SMF ¶ 48; Pl. Resp. ¶ 1].

12

From July 2008 through its closure in August 2014, TRS had total sales of approximately $38.2 million, of which approximately $36.9 million (or 96.6%) were with AT&T. [Pl. SMF ¶ 37; Def. Resp. ¶ 37]. As reflected on its 2011-2014 federal and state income tax returns, TRS reported ordinary business income as follows: 2011: $801,995; 2012: $663,022; 2013: $1,427,833; and 2014: $1,385,369. [Def. SMF ¶ 46; Pl. Resp. ¶ 1]. Simpson was a self-described compulsive gambler. [Pl. SMF ¶ 14; Def. Resp. ¶ 14]. Due to the loss of the 2014 AT&T contract, Simpson accelerated her gambling and eventually ceased the operations of TRS. [Def. SMF ¶ 53; Pl. Resp. ¶ 1].

During the time period 2011-2015, Defendant issued a number of airline tickets to Simpson and airline passengers associated with Simpson, for a collective cost of $181,336.00. [Def. SMF ¶ 55; Pl. Resp. ¶ 1]. The tickets were purchased using four different accounts, one of which was in the name of TRS and three of which were in the name of Simpson: (1) TRS's SunTrust bank account, using a business debit card ("TRS Debit Card"); (2) Simpson's SunTrust bank account, using a personal debit card ("Simpson Debit Card"); (3) an American Express credit account, using a credit card issued in the name of Simpson ("AmEx Card"); and (4) a Bank of America credit account, using a credit card issued in the name of Simpson ("BOA Card"). [Def. SMF ¶ 56; Pl. Resp. ¶ 1].

Certain of the transfers for airline tickets between June 13, 2011 and August 19, 2014 were identified as "personal." The total amount of the "personal" transfers was $90,656.38. Tickets purchased using the TRS Debit Card for the benefit of Simpson and her relatives and friends totaled $52,989.28. Such tickets purchased using the AmEx Card totaled $28,561.90.

Such tickets purchased using the BOA Card totaled $5,296. Such tickets purchased using the Simpson Debit Card totaled $3,809.20. [Pl. SMF ¶ 22; Def. Resp. ¶ 22; Stip. ¶ 3].[9]

American Express Centurion Bank and/or one or more subsidiaries or affiliates of American Express Company obtained a judgment against Simpson on or about June 11, 2013, as to which a writ of fieri facias was recorded on November 26, 2013 in Fulton County, Georgia, in the principal amount of $75,641.83. [Pl. SMF ¶ 54; Def. Resp. ¶ 54]. In addition, the Internal Revenue Service filed two federal tax liens against Simpson: one in March 2011 in the amount of $303,559.16 for unpaid 2008 and 2009 taxes; and one in June 2011 in the amount of $213,200.45 for unpaid 2010 taxes. [Pl. SMF ¶ 55; Def. Resp. ¶ 55].

Defendant is one of the world's largest airlines. [Def. SMF ¶ 1; Pl. Resp. ¶ 1]. It sells airline tickets primarily through its website or a travel fare aggregator, such as Expedia.com. [Def. SMF ¶ 4; Pl. Resp. ¶ 1]. In addition, Defendant sells airline tickets via phone, at ticket offices or airport ticket counters operated by Defendant, and through independent travel agents. [Def. SMF ¶ 5; Pl. Resp. ¶ 1]. The number of tickets purchased from Defendant by debit card or credit card is significant. In 2017, Defendant processed 126.4 million credit card and debit card transactions for the sale of airline tickets and related services. [Def. SMF ¶ 6; Pl. Resp. ¶ 1]. During the time period of 2011 to 2015, credit card and debit card transactions totaled: 81.7 million, 94.2 million, 99.7 million, 109.4 million, and 118.6 million, respectively. [Def. SMF ¶ 7; Pl. Resp. ¶ 1].

---

[9] In the Complaint, Plaintiff alleged the total transfers he seeks to recover (as opposed to just the transfers for personal use that are the subject of Plaintiff's Motion) were distributed among the various payment methods as follows: approximately $80,296 using the TRS Debit Card, approximately $83,542 using the AmEx Card, approximately $7,468 using the BOA Card, and approximately $10,030 using the Simpson Debit Card. [Comp. ¶ 55]. Defendant denied this allegation due to insufficient knowledge [Ans. ¶ 55], and neither party addressed the payment method for the totality of the transfers in their respective SMFs.

Rules and regulations promulgated by the Federal Aviation Administration require Defendant to issue airline tickets only in the name of the natural person actually completing the scheduled air travel, which may be and often is different than the individual or entity who purchases the ticket. [Def. SMF ¶ 8; Pl. Resp. ¶ 1]. The parties agree that all tickets that are the subject of the disputed transactions were issued to Simpson and others and not in the name of TRS, and TRS was never a passenger on a Delta flight.[10] [Pl. SMF ¶ 28, 31; Def. Resp. ¶ 28, 31]. Defendant's Contract of Carriage in effect at the applicable times is set forth, in relevant part, in the Stipulation. [Pl. SMF ¶ 30; Def. Resp. ¶ 30; Stip. ¶ 4 & Ex. B].

Presently and during the time period of 2011 to 2015, with respect to each debit card or credit card transaction associated with the purchase of a Delta airline ticket or related service, Defendant obtains either an approval or denial code from the card issuer or processor, as applicable. [Def. SMF ¶ 9; Pl. Resp. ¶ 1]. Elavon acts as the card processor for Visa and MasterCard transactions. [Def. SMF ¶ 10; Pl. Resp. ¶ 1]. American Express and Discover do not employ a separate card processor. [Def. SMF ¶ 11; Pl. Resp. ¶ 1]. A transaction approval code indicates that the card issuer or card processor has confirmed the form of payment is acceptable and agrees to honor the transaction amount and remit same to Defendant. [Def. SMF ¶ 12; Pl. Resp. ¶ 1]. Approval codes are remitted daily by Defendant to the card issuer or card processor in a settlement file along with the corresponding transaction information, such as the card number and billing address. The same was true during the time period 2011 to 2015. [Def. SMF ¶ 14; Pl. Resp. ¶ 1]. Defendant has no knowledge regarding the requirements set by each card issuer or card processor for issuing approval or denial codes. [Def. SMF ¶ 16; Pl. Resp. ¶ 1].

---

[10] Defendant contends the purpose for which the tickets were used is not material but does not dispute that the tickets that are the subject of the Plaintiff's Motion were used by Simpson and other individuals for personal reasons, including gambling trips, rather than for business on behalf of TRS.

15

Customers purchasing airline tickets from Defendant through its website, via phone, or at ticket offices or airport ticket counters must provide the billing address and CVV number associated with the credit card or debit card being used to complete the purchase, along with the passenger name and desired flight information. The same was true during the time period 2011 to 2015. [Def. SMF ¶ 17; Pl. Resp. ¶ 1]. Defendant has at all times adhered to the guidelines and terms of use with respect to the processing of transactions involving all major credit cards, including but not limited to Visa, Mastercard, and American Express. [Def. SMF ¶ 41; Pl. Resp. ¶ 1]. The cardholder billing information provided by the customer is verified by the Address Verification System ("AVS"), a third-party service unaffiliated with Defendant, against information on file with the respective credit card or debit card issuer. [Def. SMF ¶ 18; Pl. Resp. ¶ 1].

Simultaneously with the sale of an airline ticket purchased with a credit card or debit card, Defendant transmits by live feed to Accertify all information collected by Defendant in connection with a direct customer ticket sale (i.e., a sale not conducted through an independent third-party agent), including without limitation, the credit card or debit card payment information, passenger information, flight origination and destination locations, and IP address. [Def. SMF ¶ 19; Pl. Resp. ¶ 1]. Accertify is a third-party vendor used by Defendant, first beginning in 2010 and continuously thereafter, to review all Defendant's direct ticket sales for potential fraud. [Def. SMF ¶ 20; Pl. Resp. ¶ 1]. Accertify is widely used in the U.S.-based commercial airline industry, and by merchants across many other industries, to review card-not-present transactions (i.e., a payment card transaction where the cardholder does not physically present the card for a merchant's visual examination at the time of purchase) for potential fraud. [Def. SMF ¶ 21; Pl. Resp. ¶ 1].

16

In addition to its use of Accertify, Defendant has implemented policies and procedures to detect and deter potential fraud in credit card and debit card transactions. For example, Defendant has, since at least 2013, conducted an annual corporate product analysis across various business units to implement changes, where appropriate, in light of evolving fraud methods and chargeback patterns. [Def. SMF ¶ 29; Pl. Resp. ¶ 1]. Also, to safeguard against the use of a stolen credit card or debit card to purchase airline tickets and ensure the form of payment is presented by an authorized user, Defendant may require the purchaser to present the form of payment and a valid photo identification. [Def. SMF ¶ 30; Pl. Resp. ¶ 1]. Defendant regularly reviews its policies and procedures pertaining to credit card and debit card processing and fraud detection and mitigation to determine what changes, if any, may be necessary or appropriate in light of industry fraud trends or evolving best practices. [Def. SMF ¶ 39; Pl. Resp. ¶ 1]. Defendant's specific policies and procedures may vary from time to time as a result. [Def. SMF ¶ 32; Pl. Resp. ¶ 1]. Defendant's fraud mitigation policies and procedures, as well as those established at other U.S.-based commercial airlines, are not intended to detect instances when a company employee improperly uses corporate funds in violation of corporate governing documents, employee policies, or applicable law. [Def. SMF ¶ 31; Pl. Resp. ¶ 1].

Historically, indicators for credit card or debit card fraud have included, without limitation, IP address, date of ticket purchase relative to date of travel, and travel to certain non-U.S. destinations. [Def. SMF ¶ 33; Pl. Resp. ¶ 1]. Defendant does not consider travel to and from destinations such as Las Vegas, Nevada, or Gulfport, Mississippi, to be an indicator of credit card or debit card fraud. [Def. SMF ¶ 34; Pl. Resp. ¶ 1]. A "third-party payment," (i.e., when an airline ticket is purchased by an individual or entity other than the passenger completing the air travel) is common at Defendant and other U.S.-based commercial airlines and is generally not an

indicator of credit card or debit card fraud. [Def. SMF ¶ 35; Pl. Resp. ¶ 1]. Defendant has no knowledge of the purpose of the travel by airline passengers or those purchasing air travel, nor does Defendant inquire into the financial condition of those individuals or entities by, among other things, obtaining a credit report. [Def. SMF ¶ 36; Pl. Resp. ¶ 1]. Similarly, Defendant does not inquire into the purpose of customer airline travel, including whether an airline ticket or related service purchased with a corporate credit card or debit card is being used for a business purpose. [Def. SMF ¶ 37; Pl. Resp. ¶ 1].

Turning to the Transfers at issue in this proceeding, Simpson was an authorized signatory and user of the TRS Debit Card, the Simpson Debit Card, the AmEx Card, and the BOA Card. [Def. SMF ¶ 58; Pl. Resp. ¶ 1]. With respect to the tickets purchased using the AmEx Card or the BOA Card, TRS transferred funds directly from its bank account to American Express or Bank of America, as applicable, for payment of amounts due and owing to the respective card issuer on account of such ticket purchases. [Def. SMF ¶ 57; Pl. Resp. ¶ 1].

The tickets were recorded in the general ledger of TRS, and Simpson instructed her bookkeepers that business and personal expenses, including those for business or personal travel, should be coded in the appropriate expense category in QuickBooks for TRS. [Def. SMF ¶ 60; Pl. Resp. ¶ 12].[11] Simpson did so because she intended to identify and deal differently with airline tickets purchased for business-related travel and tickets purchased for personal travel, with the business-related travel being paid for by TRS and deducted as business expenses and the personal travel to be coded as owner's draws in QuickBooks and treated as compensation for Simpson's duties as president and manager. [Affidavit of Tammy P. Simpson ("Simpson Aff."), Doc. 80 ¶ 28; Pl. SMF ¶ 25; Def. Resp. ¶ 25].

---

[11] Although Plaintiff does not dispute Simpson testified that her instructions were not followed, he also noted that none of the ticket purchases were marked in TRS's books and records in a manner to indicate that they were for non-business travel.

Defendant processed the airline tickets and the corresponding debit and credit transactions in the ordinary course of its business through arm's-length transactions. [Def. SMF ¶ 61; Pl. Resp. ¶ 1]. The tickets were sold at fair market value. [Def. SMF ¶ 62; Pl. Resp. ¶ 1]. Had the tickets not been purchased by TRS or Simpson, they would have been available for purchase and issuance to other passengers at the prevailing market rate. [Def. SMF ¶ 67; Pl. Resp. ¶ 1]. Neither TRS nor Simpson has at any time been an insider or otherwise affiliated with Defendant. [Def. SMF ¶ 64; Pl. Resp. ¶ 1]. Defendant fully performed its obligations under the tickets by, among other things, issuing the tickets to the passenger designated by the cardholder and honoring the tickets upon presentment. [Def. SMF ¶ 65, 75; Pl. Resp. ¶ 1].

Defendant has at no time been notified by the respective card issuer or card processor that any of the debit or credit transactions were unauthorized or otherwise disputed by the cardholder. [Def. SMF ¶ 66; Pl. Resp. ¶ 1]. Accertify has at no time advised Defendant that any of the debit and credit transactions associated with the tickets were identified or resolved as fraudulent or contained any negative data points. [Def. SMF ¶ 73; Pl. Resp. ¶ 1]. Defendant did not extend any credit to either TRS or Simpson in connection with the sale of the tickets and relied solely on the approval codes issued by the card issuers and card processors to receive payment for the tickets. [Def. SMF ¶ 63; Pl. Resp. ¶ 1]. At all times, the debit and credit transactions were processed by Defendant consistent with its policies and procedures, as well as the merchant guidelines and terms of use applicable to the respective card issuer or card processor in effect at the time of the associated transactions. [Def. SMF ¶ 68; Pl. Resp. ¶ 1]. The transactions were processed consistent with the then-applicable policies, procedures, and best practices generally employed in the U.S.-based commercial airline industry. [Def. SMF ¶ 69; Pl. Resp. ¶ 1].

Consistent with its policies and procedures regarding airline ticket sales, applicable both now and at least during the time period 2011 to 2015, Defendant did not inquire into: (i) the purpose for which the tickets were intended or ultimately used; or (ii) the financial condition of the passengers associated with tickets or the cardholders associated with the debit and credit transactions. [Def. SMF ¶ 71; Pl. Resp. ¶ 1]. Simpson did not inform Defendant or any other travel service of the purpose of the tickets or of the financial condition of TRS. At no point did Defendant know Simpson was allegedly using corporate funds to pay for her personal gambling trips. [Def. SMF ¶ 72; Pl. Resp. ¶ 1]. Indeed, a substantial number of the tickets were used for travel to various events related to the business of TRS, including without limitation, lithographic trade shows, expositions, industry conferences, client or vendor visits, and product development exploration. [Def. SMF ¶ 75; Pl. Resp. ¶ 1].

When Plaintiff was asked at his Rule 30(b)(6) deposition whether he had any evidence Defendant knew why the tickets were purchased or how the tickets were ultimately used, Plaintiff conceded he did not. [Def. SMF ¶ 87; Pl. Resp. ¶ 1]. Plaintiff likewise conceded he did not have any evidence that Defendant actually knew the financial condition of TRS or Simpson. [Def. SMF ¶ 88; Pl. Resp. ¶ 1]. When questioned on whether Plaintiff had any basis for the allegations in the Complaint regarding Defendant's knowledge or lack of good faith, Plaintiff offered only "[t]he fact that there are multiple tickets being purchased by a company for individuals to fly to known gambling destinations," and "there is a process in the airline industry for airlines to be aware of and to look into situations where there might be credit card fraud especially through the use of a third party purchase." [Def. SMF ¶ 89; Pl. Resp. ¶ 1]. With respect to Defendant's purported knowledge of Simpson's alleged insolvency, Plaintiff testified

20

that a "simple credit check would have shown that she had IRS tax liens outstanding against her since 2011." [Def. SMF ¶ 90; Pl. Resp. ¶ 1].

## V. Legal Analysis

### A. Fraudulent Transfer

Plaintiff seeks entry of a judgment that TRS and Simpson made the payments identified in Plaintiff's SMF ¶ 22 with actual intent to hinder, delay, or defraud creditors of TRS or creditors of Simpson or that the transfers were constructively fraudulent. Defendant seeks a judgment that all the transfers identified in the Complaint were not fraudulent, or that it is entitled to a defense to avoidability of the transfers or to liability for the transfers.

Transfers made with actual intent to hinder, delay, or defraud creditors are avoidable pursuant to 11 U.S.C. § 548 or pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-74(a).

Bankruptcy Code § 548 states in relevant part:

The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

Bankruptcy Code § 544 states in relevant part:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

The applicable law referenced in § 544(b)(1) is the Georgia Uniform Fraudulent Transactions Act ("GAUFTA"), O.C.G.A. § 18-2-70 et seq (2002).[12] The version of the law in effect at the time of the transfers, provides in relevant part as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

O.C.G.A. § 18-2-74(a)(1) (2002).

Constructively fraudulent transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) or § 544 and O.C.G.A. §§ 18-2-74(a)(2) and -75(a).

Bankruptcy Code § 548(a)(1)(B) provides in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> …
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B).

The GAUFTA provides a transfer is voidable as to a pre-transfer or post-transfer creditor if the debtor made the transfer:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[12] The law was amended effective July 1, 2015 and is now known as the Uniform Voidable Transactions Act. O.C.G.A. § 18-2-70 (2015). All the transactions at issue in this proceeding occurred under the prior version of the law and, unless otherwise specified, all citations are to the prior version of the law.

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

O.C.G.A. § 18-2-74(a)(2).

With respect to pre-transfer creditors only, the GAUFTA also provides that a transfer is voidable "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.* § 18-2-75(a).

While § 548 has a two-year lookback period, the GAUFTA has a lookback period of four years. O.C.G.A. § 18-2-79(1). In either case, the trustee must file suit within two years after the entry of the order for relief. 11 U.S.C. § 546(a)(1). All the transfers at issue here occurred within two years or four years of the petition date, April 3, 2015, and this adversary proceeding was commenced within two years after the petition date.

The analysis of alleged fraudulent transfers under state law and bankruptcy law is substantially the same. *Pettie v. Bonertz (In re LendXFinancial, LLC)*, 2012 WL 1597394, *7, 12 (Bankr. N.D. Ga. March 19, 2012) (Diehl, J.).

### 1. Actual Intent to Hinder, Delay, or Defraud Creditors

The elements of a claim for actual fraudulent transfer are: (1) a transfer; (2) of an interest of property of the debtor[13]; (3) made with actual intent to hinder, delay, or defraud a creditor. Here, the parties do not dispute that either TRS or Simpson purchased airline tickets

---

[13] Although O.C.G.A. § 18-2-74 does not specify that the property must be property of the debtor, § 18-2-76(4) states that "[a] transfer is not made until the debtor has acquired rights in the asset transferred[.]"

from Defendant with debit or credit cards.[14] However, there is some question about whether the transfers were of property of Simpson or property of TRS.

The Bankruptcy Code defines a transfer as, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). The GAUFTA adopts an almost identical definition of transfer except that it refers to the transfer of "an asset or an interest in an asset" rather than "property." O.C.G.A. § 18-2-71(12) (2003). The GAUFTA defines "asset" as "property of a debtor[.]" *Id.* § 18-2-71(2). It is undisputed that TRS maintained a bank account at SunTrust and that TRS, through its authorized signatory Simpson, used the TRS Debit Card to purchase plane tickets from Defendant. Thus, the undisputed facts establish that the payments made with the TRS Debit Card constituted a transfer of an interest of property by TRS. It is further undisputed that Simpson maintained a bank account at SunTrust and that Simpson used the Simpson Debit Card to purchase plane tickets from Defendant.[15] Thus, the undisputed facts establish that the payments made with the Simpson Debit Card constituted a transfer of an interest of property by Simpson. It is further undisputed that Simpson maintained credit accounts with AmEx and BOA, that Simpson used the AmEx Card and the BOA Card to purchase plane tickets from Defendant, and that TRS thereafter paid the bills for the two credit cards. Thus, the undisputed facts establish that the purchases made with the AmEx Card and the BOA Card constituted a transfer of an interest in property by Simpson.[16]

---

[14] The parties dispute the identity of the initial transferee of the transfers, but as explained below, the Court need not reach that question to decide the Motions.

[15] According to Plaintiff, Simpson caused TRS to deposit the funds into her account, but those transfers are not the subject of this proceeding and there is no allegation or suggestion that Simpson was holding the funds in trust for TRS.

[16] The facts indicate that TRS subsequently transferred an interest in its property to pay Simpson's credit cards. But those later transfers are not the subject of this proceeding.

The only remaining question is whether Plaintiff has established the requisite intent. Courts recognize that direct proof of fraudulent intent is rarely available; therefore, it may be established by circumstantial evidence. *Bishop v. Patton*, 288 Ga. 600, 607, 706 S.E.2d 634, 640 (2011) (disapproved on other grounds *by SRB Inv. Servs., LLLP v. Branch Banking and Trust Co*., 289 Ga. 1, 709 S.E.2d 267 (2011)); *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998). Plaintiff contends that because "intent to hinder, delay, or defraud" is phrased in the disjunctive, he need only prove intent as to one of the three actions. *LendXFinancial*, 2012 WL 1597394, at *5 (citations omitted); *see also* 5 Collier on Bankruptcy ¶ 548.04[1][a] ("The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The requirement is disjunctive; any one of the three intents is sufficient for liability."). To establish the requisite intent, "the trustee must show that the debtor had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends." Collier ¶ 548.04[1][a].

O.C.G.A. § 18-2-74(b) sets forth a non-exclusive list of factors, or badges of fraud, for courts to consider in determining whether a transfer was made with the requisite intent. Courts rely on the same factors under § 548:

> (1) The transfer or obligation was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer or obligation was disclosed or concealed;
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) The transfer was of substantially all the debtor's assets;
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b); *XYZ Options,*154 F.3d at 1272. "Although the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the confluence of several can constitute conclusive evidence of actual intent to defraud." *XYZ Options,*154 F.3d at 1271 n. 17 (citations and internal quotation marks omitted); *see also LaMarca v. Jansen (In re Bifani)*, 580 F. App'x 740, 745 (11th Cir. 2014) (quoting *General Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 327 (Fla Dist. Ct. App. 2013)) ("The existence of badges of fraud creates a prima facie case and raises a rebuttable presumption that the transaction is void"); *compare Bishop*, 288 Ga. at 607-08, 706 S.E.2d at 640-41 ("Unlike the common law, however, the UFTA *does not* create a 'rebuttable presumption' of fraud based on the existence of one or more of the eleven listed factors.") (emphasis added).

In addition to the badges of fraud set forth above, Plaintiff offers additional badges the Court may consider:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

*Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 810 (Bankr. D.N.D. 2008) (citation omitted) (analyzing 11 U.S.C. § 727(a)(2)); *see also Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998). Defendant contends the Court should not consider these factors. However, to a large

26

extent the additional factors are subsumed by or redundant with the factors set forth in *XYZ Options* and O.C.G.A. § 18-2-74(b). Furthermore, the *XYZ Options* factors are non-exclusive, and the test is one of all relevant circumstances. *Furr v. TD Bank, NA (In re Rollaguard Sec., LLC)*, 591 B.R. 895, 917 (Bank. S.D. Fla. 2018). Therefore, the Court will not exclude consideration of the additional factors.

Plaintiff contends that Simpson and TRS, as directed and managed by Simpson, were delaying payments to creditors so Simpson could use the funds to travel with friends and relatives to gambling locations and gamble, rather than pay creditors, with the gambler's expectation of "hitting the big one" so Simpson could pay off the creditors. Plaintiff further contends that evidence shows certain badges of fraud with respect to the tickets purchased for personal use as follows: the transfers (1) were made to or for the benefit of an insider or close relation, (2) were made while TRS and Simpson were insolvent, (3) were made while Simpson had tax liens and a judgment against her; (4) were of no objective value to TRS or Simpson, diminished their respective estates, and deprived their creditors of those funds to pay their debts; (5) were made while Simpson was in a trust relationship with TRS and its creditors and breached her duties by taking excessive distributions; (6) resulted in a cumulative effect of diminishing the amounts available to pay creditors and at a minimum delayed payment; (7) were part of a general pattern of removing and dissipating assets to fund gambling activity and for TRS to pay for travel by Simpson and others.

With respect to the relationship between the transferor and the transferee, Defendant correctly points out that none of the transfers at issue in this proceeding were made to Simpson or her friends or relatives. Rather the transfers were to Defendant, which the parties

agree is not an insider of Simpson or TRS.[17] Nevertheless, the close relationship between Debtors and the beneficiaries of the transfers (Simpson and her friends and family) is relevant to the question of intent.[18] Plaintiff also contends that Simpson, as the manager of an insolvent Georgia limited liability company, was in a trust relationship with TRS and its creditors at the time of the transfers and breached those duties by taking excessive owner draws. But the owner draws are the not the transfers at issue in this case. The transfers are the purchase of airline tickets, and there is no evidence of a trust relationship between Defendant and either Simpson or TRS. *See Hubbel Steel Corp. v. Cook (In re Cook)*, 126 B.R. 261, 269 (Bankr. E.D. Texas 1991) (badges of fraud include "existence of a trust or trust relationship *between the debtor and the person to whom the property was conveyed*") (emphasis added). Indeed, it is undisputed that the tickets were purchased in arms-length transactions.

With respect to insolvency, Defendant has agreed to assume TRS and Simpson were insolvent for purposes of summary judgment. Plaintiff points to judgment and tax liens against Simpson as proof she was sued or threatened with suit at the time of the transfers. This may be evidence of Simpson's intent, but not of TRS's intent.

Plaintiff contends the transfers were made for inadequate or no consideration because neither TRS nor Simpson received objective value for tickets purchased for personal use, their respective estates were diminished by the amount of the transfers, and their creditors were deprived of those funds to pay their debts. The cumulative effect of the transfers, which resulted from Simpson's gambling, substantially diminished the amounts available to pay Simpson's and TRS's creditors and delayed and/or hindered the payment of their debts and/or

---

[17] With respect to recovery of the transfers under 11 U.S.C. § 550(a), Defendant argues the initial transferees were the financial institutions that issued the debit and credit cards used to pay for the airline tickets. Even if Defendant is correct, the financial institutions are likewise not insiders of Simpson or TRS.

[18] The Court notes that none of the badges of fraud cited by Plaintiff include transfers made *for the benefit of* an insider. Nevertheless, the beneficiary of the transfer goes to the totality of the circumstances.

defrauded them. And, the general chronology of events shows Simpson was a compulsive gambler, and the transfers to Defendant were part of a general pattern of removing and dissipating assets to fund gambling activities and to pay for travel by Simpson and others to accompany her.

The Eleventh Circuit has stated that "under § 548, in assessing the 'value' of property, goods, or services provided directly to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or services provided had objective value." *McHenry v. Dillworth (In re Caribbean Fuels Am., Inc.)*, 688 F. App'x 890, 894-95 (11th Cir. 2017) (evaluating lack of reasonably equivalent value in the context of constructive fraud). Whether or not the "objective value" standard applies when analyzing badges of fraud to determine intent, there is no dispute that Defendant provided airline tickets at fair market value in exchange for the funds it received.[19] And, the record does not reflect that the payments made to purchase the airline tickets consumed substantially all of TRS's or Simpson's assets. Furthermore, the nature of airline tickets as a consumable undermines any suggestion that the transfers were a sham to put the money out of reach of creditors while the Debtors maintained control of the underlying asset.

To rebut the badges of fraud, Defendant argues that the Court has direct evidence of Simpson's intent in the form of her deposition testimony in which she stated that she never intended for creditors to go unpaid, and that they would have been paid if she had not lost AT&T's business. The parties do not dispute that all the ticket purchases were disclosed in TRS's books and records. The parties also agree that Simpson testified that she intended any tickets purchased for personal use to be coded as owner's draws, which she considered

---

[19] Questions about the extent to which the value of the tickets was received by the Debtors as opposed to third parties are addressed below in the discussion of constructive fraud.

compensation for her services to TRS, and that any failure to do so was error by her bookkeepers.[20] Thus, none of the ticket purchases were concealed, however the purpose of the purchases whether for personal or business use was not disclosed in TRS's records. The parties disagree if this was due to unintentional bookkeeper error or was purposeful notwithstanding what Plaintiff characterizes as Simpson's self serving testimony.[21]  It is undisputed that the tickets were not purchased for less than fair market value.

When considered against TRS's and Simpson's insolvency, the relationship between the transferors and the beneficiaries of the tickets, and the tax liens against Simpson, the circumstantial evidence is not sufficient to establish a prima facie case of actual intent to hinder, delay, or defraud creditors by TRS as to transfers made using the TRS Debit Card.

With respect to Simpson, the question is a closer one. Unlike TRS, she was subject to judgment and tax liens prior to the transfers. However, Simpson does not fit the typical scenario in which this factor is indicative of fraud. Usually, when the debtor is sued, he transfers assets to an insider for little or no consideration; thus, the asset is preserved for the debtor's benefit while keeping it from creditors. Here, Simpson purchased services, and the services were provided. Perhaps her spending was irresponsible in light of her debts, but poor judgment is not necessarily indicative of intent to hinder, delay, or defraud. Furthermore, in the face of Simpson's affidavit statements as to intent and the general reluctance to determine intent on summary judgment, *see Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, 374 B.R. 333, 346 (Bankr. S.D. Fla. 2007), the Court cannot conclude as a matter of law whether or not the transfers by Simpson using the Simpson Debit Card, the AmEx Card, or the BOA Card were made with the requisite intent.

---

[20] Plaintiff asserted in his Response to Defendant's SMF that none of the personal tickets were coded as owner's draws. [Pl. Resp. ¶ 12]. Defendant did not dispute that assertion.
[21] *See* Plaintiff's SMF ¶ 25, Pl. Resp. ¶ 12, Simpson Aff. ¶¶ 26-28.

Based on the foregoing, Plaintiff's Motion must be denied with respect to 11
U.S.C. § 548(a)(1)(A) and § 544(b), incorporating O.C.G.A. § 18-2-74(a). Defendant's Motion
must be granted as to transfers made using the TRS Debit Card and denied as to transfers using
the Simpson Debit Card, the AmEx Card, and the BOA Card.

### 2. Constructive Fraud

To establish a claim under § 548(a)(1)(B) Plaintiff must prove that

> (1) the debtor had an interest in property; (2) the transfer of that
> interest occurred within two years of the bankruptcy petition; (3)
> the debtor was insolvent at the time of the transfer or became
> insolvent as a result thereof; and (4) the debtor received less than
> reasonably equivalent value in exchange for such transfer.

*XYZ Options*, 154 F.3d at 1275. The elements necessary to establish a constructively fraudulent
claim under Georgia law are the same, except that the transfer must have occurred within four
years of the petition date. *Kipperman v. Onex Corp.*, 411 B.R. 805, 828 (N.D. Ga. 2009).

As discussed in the prior section, the transfers are of an interest of TRS or
Simpson in property, and Defendant has conceded the Debtors' insolvency for purposes of
summary judgment. There is no dispute the transfers occurred within four years of the petition
date, and in some cases within two years of the petition date. The only remaining question is
whether the Debtors received reasonably equivalent value for the purchase of the tickets.

The Code defines "value" in § 548(d)(2) as "property, or satisfaction or securing
of a present or antecedent debt of the debtor, but does not include an unperformed promise to
furnish support to the debtor or to a relative of the debtor." However, it does not define
"reasonably equivalent value." In *General Elec. Credit Corp. of Tenn. v. Murphy (In re
Rodriguez)*, 895 F.2d 725 (11th Cir. 1990), the Eleventh Circuit said, "[t]he purpose of voiding
transfers unsupported by 'reasonably equivalent value' is to protect creditors against the

31

depletion of a bankrupt's estate. ... Therefore [§ 548(a)] does not authorize voiding a transfer which 'confers an economic benefit upon the debtor,' either directly or indirectly.'" *Id.* at 727 (citing *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981)). Reasonable equivalence does not require a dollar for dollar exchange. *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc)*, 615 F. App'x. 925, 932 (11th Cir. 2015) (quoting *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013)). Rather, the debtor must have received a fair exchange after consideration of the burdens and benefits to the debtor. *Howell v. Fulford (In re of Southern Home and Ranch Supply, Inc.)*, 561 B.R. 810, 815 (Bankr. N.D. Ga. 2016) (Drake, J.).

"The issue of whether a debtor received reasonable equivalent value is a question of fact that must be evaluated as of the date of the transaction. Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors." *Kipperman*, 411 B.R. at 837 (citations and quotation marks omitted); *Southern Home and Ranch Supply*, 561 B.R. at 816; *Pettie v. Ringo (In re White)*, No. 14-65320, AP No. 15-5421, 2018 WL 2246579, at *5 (May 15, 2018) (Hagenau, J.). To determine if the debtor received reasonably equivalent value when it transferred property the Court applies a two-part test: (1) did the debtor receive any value whatsoever, whether in the form of an indirect or direct benefit; and (2) was the value reasonably equivalent to the property transferred. *LendXFinancial,* 2012 WL 1597394, at *8 (citing *Pension Transfer Corp. v. Beneficiaries (In re Fuehauf Trailer Corp)*, 444 F.3d 203, 212-14 (3d Cir. 2006)).[22]

---

[22] Some bankruptcy judges in this district break the test into three parts: (1) did the debtor receive value; (2) was the value received in exchange for the property transferred; and (3) was the value received reasonably equivalent to the value of the property transferred. *Mann v. Brown (In re Knight)*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012) (Drake, J.); *accord Wallace v. McFarland (In re McFarland)*, 619 F. App'x 962, 975 (11th Cir. 2015) (citing *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (BAP 8th Cir. 2001)).

The test requires that the debtor receive value. Defendant argues that in the Eleventh Circuit, value is determined on an objective basis and does not ask what subjective value the debtor received. *Caribbean Fuels Am.*, 688 F. App'x at 894-95. Plaintiff agrees that an objective test applies, but contends that the objective value must be determined from the perspective of the debtor's creditors because the Uniform Fraudulent Transfer Act is a creditor protection statute. *See Shockley v. Commissioner of Internal Revenue*, 872 F.3d 1235, 1248 (11th Cir. 2017) (applying Wisconsin law). Both parties are correct as indicated in *Orlick v. Kozyak (In re Financial Federated Title & Trust, Inc.)*, 309 F.3d 1325 (11th Cir. 2002) and *Rodriguez*, 895 F.2d 725.

At issue in *Financial Federated* was whether an employee of a debtor engaged in a Ponzi scheme can give value to the debtor in the context of § 548(c). The court adopted the reasoning of *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985 (D. Utah 1986), which stated that "'[t]he fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value .... [A] determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.'" 309 F.3d at 1332 (quoting *Universal Clearing House*, 60 B.R. at 998, 999); *see also PSN USA* 615 F. App'x at 932) (the debtor may receive value even if the transfer increases its insolvency). Thus, the measure of value is an objective one.

In *Rodriguez*, the debtor was a holding company that made loan payments on a subsidiary's airplane. 895 F.2d at 726. The court found the debtor did not receive any value for the payments because it was not liable for the debt and did not benefit from a reduction in the debt. *Id.* at 728. In addition, as a holding company, it could not use the plane or receive any

economic benefit from use of the plane. *Id.* Thus, value was measured from the perspective of the debtor.

The court reached a different result when the debtor's role was reversed. In *PSN USA*, the debtor made payments under a contract between the defendant and the debtor's parent company for provision of satellite services. 615 F. App'x. 925. However, in *PSN USA*, the parent company was the holding company and the debtor was the operating entity. Although the debtor was not a party to the service contract, it used the satellite services provided by the defendant to operate and broadcast a cable channel. *Id.* at 926. The court rejected the plaintiff's argument that "value under § 548 is not received in exchange for a transfer unless the transferor 'obtained some kind of enforceable entitlement to some tangible or intangible article.'" *Id.* at 929 (quoting *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 868 n.55 (Bankr. S.D. Fla. 2009)). Instead, the court stated that the term "value" is construed broadly under the Bankruptcy Code, such that the appropriate test is "whether the transfer 'confers an economic benefit upon the debtor, either directly or indirectly ... not whether the debtor received property rights by virtue of a transfer or whether the debtor was a party to the contract at issue." *Id.* at 930 (citations omitted). Furthermore, value may be derived from services or from benefits without any associated property rights, such as time. *Id.* The court distinguished *Rodriguez* because in that case the debtor was unable to share in the enjoyment of or use of a good or service. *Id.* at 931.

The Eleventh Circuit reiterated these principles in *Caribbean Fuels*. 688 F. App'x 890. In that case the corporate debtor and its principals were parties to a lease agreement with the defendant for residential real property. The principals lived in the property, worked from the property, and entertained the debtor's business associates at the property. *Id.* at 892. The debtor

paid a portion of the rent on the property, and the trustee sought to recover those payments, contending the debtor received no value from the lease. *Id.* at 892-93. The court disagreed, stating that "under § 548, in assessing the 'value' of property, goods, or services provided directly to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or services provided had objective value." *Id.* at 894-95. The court recognized that a different test may apply when evaluating the value of indirect, rather than direct, benefits. A multifactor test that "considers 'the good faith of the parties, the disparity between the fair value of the property [transferred from the debtor to a third party] and what the debtor actually received, and whether the transaction was at arm's length' ... may apply where the purported benefits to the debtor are indirect." *Id.* at 895 n.3 (quoting *Kapila v. WLN Family Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006)). The foregoing cases also support the proposition that even when a third party benefits from the transfer, the debtor may receive value. *PSN USA*, 615 F. App'x at 928 (citing *Rodriguez*, 895 F.2d at 727). *See also Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991) (quoting *First Nat'l Bank in Anoka v. Minnesota Util. Contr., Inc.* (*In re Minnesota Util. Contr., Inc.)*, 101 B.R. 72, 85 (Bankr. D. Minn. 1989), *reversed on other grounds by* 110 B.R. 414 (D. Minn. 1990)) (although transfers solely for the benefit of a third party generally do not constitute reasonably equivalent value, "an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party 'are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree.'"); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) ("although 'transfers solely for the benefit of third parties do not furnish fair consideration' ... the

35

transaction's benefit to the debtor 'need not be direct; it may come indirectly through benefit to a third person.").

Plaintiff argues TRS and Simpson did not receive any value from the tickets purchased from Defendant because the tickets were used by Simpson and other individuals to go on gambling trips which could not and did not benefit TRS or Simpson. Defendant argues that at the time of the transfers, the Debtors received value in the form of a seat on an airplane, along with the ability to change various aspects of the ticket, including the identity of the individual traveling on the ticket and the destination. Plaintiff argues the Debtors did not benefit from tickets purchased for personal use of third parties.[23] Instead the tickets were gifts to the third parties because TRS received no property from Defendant.

In her affidavit, Simpson indicated that tickets paid by TRS for her personal travel were intended to be part of her compensation from TRS and should have been marked as owner draws in TRS's books. In other words, TRS received value in the form of Simpson's services. Plaintiff argues that such payments were not compensation for services but were payments on account of Simpson's equity interest. *See Kardash v. Commissioner of IRS*, 866 F.3d 1249, 1255 (11th Cir. 2017) (dividends are not compensation). Plaintiff offered no evidence that the payments were made on account of equity rather than compensation for services, other than Simpson's reference to "owner draws." However, Simpson explained that she understood owner draws to mean compensation and that the payments were intended as compensation. Accordingly, the evidence does not support Plaintiff.

Plaintiff also argues that any indirect benefit the Debtors received for the transfers must be tangible. *See Official Comm. of Unsecured Creditors v. State of Fla. (In re Tower*

---

[23] Plaintiff indicated that plane ticket purchased by a corporate debtor can benefit the debtor, in some circumstances. "Although the business cannot be a passenger, it can (and usually does) receive value when those tickets are used for business purposes." [Doc. 90-1 at 4].

*Environmental, Inc.)*, 260 B.R. 213 (Bankr. M.D. Fla. 1998); *Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Ark., Inc.)*, 309 B.R. 314, 319 (BAP 8th Cir. 2004); *Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117 F.3d 1078, 1080 (8th Cir. 1997). Plaintiff contends the only benefit received by TRS in exchange for the personal use tickets was Simpson's ability to have creative thoughts while gambling, and such benefits were amorphous and intangible. With respect to the purchase of personal use tickets by TRS and Simpson, there was no economic benefit by way of enhancement or preservation of their net worth.

In *Tower*, which involved the debtor's payment of a fine in connection with a plea agreement on criminal charges, the court stated that the determination of value "involves whether the debtor received any 'realizable commercial value' as a result of the transaction." *Id.* at 225 (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996)). However, the court in *Tower* went on to note that "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' ...." *Id.* at 225 (quoting *R.M.L.*, 92 F.3d at 148) (quotation marks omitted). In *Southern Health*, as in *Rodriguez*, the debtor was making mortgage payments on behalf of a third party, and there was no evidence of any quantifiable benefit to the debtor, direct or indirect. 309 B.R. at 320. In *Bargfrede*, the trustee sought to recover funds transferred by the debtor to pay a civil judgment against his wife. 117 F.3d at 1089. The court found that "indirect, non-economic benefits [to the debtor] in the form of a release of a possible burden on the martial relationship and the preservation of a family relationship" were "sufficiently analogous to other intangible, psychological benefits to conclude that they do not constitute reasonably equivalent value." *Id.* at 1080. By contrast, in *PSN USA*, the court noted that where the value provided by a transferee falls within the definition of

"property," it cannot be equated to "love or affection or other concepts that are not recognized as having value under the Bankruptcy Code." 615 F. App'x at 932 n.10. "The satellite services in this case are concrete and quantifiable." *Id.*

Defendant argues that Plaintiff is improperly relying on hindsight to determine value rather than determining value at the time of the transaction. *See Pettigrew v. Rollins (In re Rollins)*, No. 07-80682, AP 09-6054, 2011 WL 4790919, *2 (Bankr. N.D. Ga. Sep. 29, 2011) (Murphy, J.) (analyzing circumstances as they existed at the time of the transfer); *Kipperman*, 411 B.R. at 837. When the Debtors purchased the plane tickets, they received value in the form of a seat on an airplane, the right to cancel the flight, the right to modify the scheduled travel date or destination, the right to change the designated passenger, and the right to dispute the associated charge with the card issuer or processor. Defendant argues that the activities of passengers after they arrived at their destination and de-boarded the plane, does not change the value received at the time of the purchase. In other words, the value received by the Debtors was not an airline ticket for personal use; it was an airline ticket controlled by the Debtor that purchased the ticket. *See Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 679 (Bankr. S.D.N.Y 2000) ("the analysis which must be used to determine value is a commercial equation which looks to the actual transaction between the debtor and the transferee, and the Court must measure 'what was given and received' *in that transaction*.") (emphasis in original); *DeGiacamo v. Sacred Heart Univ., Inc. (In re Palladino)*, 556 B.R. 10, 16 (Bankr. D. Mass. 2016) ("future outcome cannot be the standard for determining whether one receives reasonably equivalent value at the time of a payment");[24] *see also Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 581 (Tex. Sup. Ct. 2016) ("Valuing consideration based on

---

[24] Plaintiff states that "there is nothing wrong with that general statement" but argues the facts of *Palladino* are distinguishable because it deals with college tuition paid by the student's parents. [Doc. 92 at 10].

how the debtor decides to use it improperly applies a post hoc evaluation of the transaction.")

(interpreting the Texas UFTA).

> As the Court in *Churchill* said,
>
> Not every transaction which has the effect of "exacerbating the
> harm to creditors by increasing the amount of claims while
> diminishing the debtor's estate" is a fraudulent conveyance.
> Section 548 is not a catch-all provision. It allows the trustee to
> avoid only the transfers prescribed by the statute. Often, a debtor
> prior to bankruptcy will make improvident purchases or
> expenditures which have a detrimental effect on creditors and may
> even be the precipitating cause of bankruptcy. A spendthrift debtor
> may purchase clothes or a new car, take costly vacations on credit,
> or otherwise incur unpayable debts for goods or services. The fact
> that all these transactions may be said to "exacerbate the harm to
> creditors and diminish the debtor's estate" from an overall
> perspective does not mean that the debtor received less than
> reasonably equivalent value in respect of each particular
> transaction.

256 B.R. at 681.

In *Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709 (BAP 9th

Cir. 1996), the debtor operated a Ponzi scheme in which he told customers he could get them

luxury cars at wholesale prices. The debtor collected funds from multiple buyers and used the

funds to purchase as many cars as he could at retail prices. He paid the car dealership from his

account and directed the dealership where to deliver the cars and in whose name to title the cars.

*Id.* at 712-13. Notwithstanding the fact that the cars were never titled in the debtor's name, the

court found that the debtor was the transferee of the cars. *Id.* at 715. "Viewing the transaction in

its entirety, the logical and equitable construct has Cohen not acting as the agent of any particular

Ponzi scheme participant. He had the unfettered power to designate to whom the vehicles would

be transferred." *Id.*

> Routine commercial practice has retail merchants selling goods to
> one individual and delivering them to, or holding them for pick-up

39

by, another individual. So long as a merchant has no reason to suspect the customer's Ponzi scheme or other skullduggery, sales made under ordinary commercial terms should be viewed as transactions between merchant and customer. Whether such a sale is avoidable in a manner that exposes the merchant to liability should depend upon the substantive merits of the merchant-customer transaction, not on some artificiality of form.

*Id.* Although *Cohen* involved a transfer that was subject to Article 2 of the Uniform Commercial Code, it is analogous to this case. The transactions here were between the Debtors and Defendant. Customers often purchase tickets from Defendant for third parties. As the purchasers, the Debtors had control over various aspects of the tickets, including the power to designate the name of the passenger for each ticket, which was part of the value received by the Debtors.

It is undisputed that TRS could not use the tickets because it is a corporate entity, but that Simpson, its sole officer, and in some instances her friends and family used the tickets purchased with the transfers Plaintiff seeks to avoid. It is undisputed that the transfers were made to purchase airline tickets from Defendant. It is further undisputed that the tickets were sold at their usual market price and that the transactions between the Debtors and Defendant were arm's length transactions. It is further undisputed that if the Debtors had not purchased the tickets that Defendant would have offered the tickets to the public for sale at the prevailing market price. The tickets allowed the named passenger to fly from point A to point B and provided certain abilities to change or cancel the tickets. At the time of the purchase of each of the tickets, the question is whether the Debtors received any value, that is whether they received the "mere opportunity" for a benefit. At the time each of the tickets was purchased the travel had not occurred. Thus, the Court cannot agree with Plaintiff's argument that there was no value whatsoever to TRS or Simpson when the tickets were purchased. At the point of purchase the tickets provided the benefit of having a seat on a particular flight, to change the passenger on that

flight, to change or cancel that seat, and to use the ticket for up to one year. Although Plaintiff argues that TRS did not have any business activities in some of the destinations the tickets provided transportation to, all that is required for value is a potential economic benefit. Because Simpson could have met clients in any location or sought to generate new accounts or otherwise conducted business in the destination cities and because the analysis must consider value at the time of the transfer, the Court cannot conclude that there was not a potential economic benefit to TRS or Simpson as the sole member of TRS.

With respect to whether the value was reasonably equivalent it is undisputed that all the tickets were sold to the Debtors at fair market value. Nor is there any dispute that the Debtors obtained the same rights with respect to the tickets as any other purchaser received. Accordingly, the Court finds that the Debtors received reasonably equivalent value for the transfers, and Plaintiff is not entitled to summary judgment on his constructive fraud claims.

### 3. The "Good-Faith, For Value" Defense

Even if the transfers were avoidable, Defendant argues that it has a complete defense as a good-faith transferee for value. Both the Bankruptcy Code and the GAUFTA limit the avoidability of fraudulent transfers as follows:

> [A] transferee or obligee of such a transfer or obligation that takes for value and in good faith ... may retain any interest transferred … to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

> (a) A transfer or obligation is not voidable under paragraph (1) of subsection (a) of Code Section 18-2-74 [actual fraud] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.
> ...
> (d) Notwithstanding voidability of a transfer or an obligation under this article, a good faith transferee or obligee is entitled, to the

extent of the value given the debtor for the transfer or obligation, to:

...

(3) A reduction in the amount of the liability on the judgment.

O.C.G.A. § 18-2-78(a), (d). Thus, the defense applies differently to § 548 claims and state law claims. Under § 548(c), regardless of the type of fraud, the transfer is not avoidable if the transferee took for value and in good faith to the extent of the value given. *Williams v. FDIC (In re Positive Health Mgmt.)*, 769 F.3d 899, 907 (5th Cir. 2014). With respect to actual fraud under state law, the transfer is not avoidable if the transferee took for reasonably equivalent value and in good faith. O.C.G.A. § 18-2-78(a). In contrast, with respect to constructive fraud under state law, there is no defense to avoidability, but the transferee's liability is reduced to the extent it gave value to the debtor in good faith. O.C.G.A. § 18-2-78(d)(3). This defense can only be raised after a transfer is found to be fraudulent. *Post-Confirmation Comm. for Small Loans, Inc. v. Innovate Loan Serv. Corp.*, No. 1:13-cv-191, 2015 WL 5769229, at *8 (M.D. Ga. Sept. 30, 2015). These protections constitute affirmative defenses and the burden of proof to establish entitlement to the defense is on Defendant. *Perkins v. Haines,* 661 F.3d 623, 626 (11th Cir. 2011).

With respect to value, as explained in the discussion of constructive fraudulent transfers, in the Eleventh Circuit value under § 548, including the good-faith defense, is considered on an objective basis. *Financial Federated*, 309 F.3d at 1332. The difference between the value analysis under § 548(a) and § 548(c) is the perspective. Under § 548(c) value is considered from the perspective of the transferee giving value rather than from the debtor/transferor's perspective of what value was received. *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002). Thus, the value analysis for the good-

faith defense is viewed from Defendant's perspective and the question is "[h]ow much did the transferee 'give?' The concern here ... is for the transferee's side of the exchange, not the transferor's gain." *Id.* This is, as has been explained by the Fifth Circuit in *Hannover,* completely logical because the § 548(a) inquiry is into the loss to the debtor – that is the injury to the estate that makes the transfer voidable – while the affirmative defense in § 548(c) looks at what the transferee gave back and thus, its cost to the transferee. *Id.* at 802.

Here, the Court has already determined that the Debtors received reasonably equivalent value in purchasing the tickets at issue in this proceeding. The Court further finds that the undisputed facts establish that Defendant gave as much as it received in selling the tickets to TRS and Simpson. This is true because the tickets were sold in arm's length transactions, for fair market value, and Defendant gave up the ability to sell the tickets to anyone else in the buying public at the prevailing market rate. Consequently, the cost to Defendant was equal to what it was paid.

Next the Court will consider Defendant's good faith. Good faith is not defined in the Bankruptcy Code, and the Eleventh Circuit has not established a standard for determining good faith in the context of § 548(c). As one court noted, "courts have struggled in applying this term, and the case law discussing Section 548(c)'s good faith affirmative defense is marked by a lack of clarity if not outright confusion." *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 309 (S.D.N.Y 2010) (collecting cases). The court in *Bayou Group* extracted a two-step inquiry from the case law: The first step is to determine "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." *Id.* at 310. If the transferee did have the requisite notice, the second step is to determine whether a diligent

inquiry would have discovered the fraudulent purpose. *Id.* at 312. In *Bayou Group*, the court determined an objective standard applies to both parts of the test. *Id.* at 313. *See also Perkins v. Lehman Bros., Inc.*, No. 1:17-cv-0302-SCJ, at 4 (N.D. Ga. Feb. 12, 2018) (unpublished); *but see Taneja*, 743 F.3d at 435 (requiring a showing of both subjective and objective good faith); *Meoli v. The Huntington National Bank*, 848 F.3d 716, 734 (6th Cir. 2017) (holding that the bankruptcy court did not err in applying a subjective standard to a good faith determination).[25] As a result, "transferees cannot simply bury their heads in the sand and later claim they took in good faith if they remain willfully ignorant in the face of facts which cry out for investigation." *Kerr v. Roeser (In re Hackney)*, No. 09-79795, AP 13-5056, 2014 WL 4059787 at *5 (Bankr. N.D. Ga. Apr. 2, 2014) (Sacca, J.) (citing *Brown v. Sherman (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995); *Goldman v. Capital City Mortg. Corp. (In re Nieves)*, 648 F.3d 232, 239-41 (4th Cir. 2011)) (internal citations and quotation marks omitted) (analyzing good faith under § 550(b)). Also relevant is whether the transaction "carries the earmarks of an arms-length bargain." *Sherman*, 67 F.3d at 1355 (citations and internal quotation marks omitted); *see also Hirsch v. Cahill (In re Colonial Realty Co).*, 210 B.R. 921, 923 (Bankr. D. Conn. 1997) (finding that good faith requires an arm's length transaction as well as: "(i) an honest belief in the propriety of the activities in question; (ii) no intent to take unconscionable advantage of others; and (iii) no intent to, or knowledge of the fact that the activities in question will hinder, delay or defraud others"). Finally, whether a party is on inquiry notice of fraud is to be viewed in light of the "standards,

---

[25] The Eleventh Circuit has not ruled on this issue, but it has discussed good faith in the context of the mere conduit defense under § 550(a)(1). *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1323 (11th Cir. 2010); *accord Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 994 (11th Cir. 2014) (good faith established for mere conduit defense on a motion to dismiss when the complaint under Florida's UFTA "failed to show, or create a plausible inference, that the [defendant] had actual knowledge of the Ponzi scheme, or that an ordinary prudent person would have been induced to make inquiry or investigate."). While the circuit court has not decided whether the analysis of good faith is based on an objective or subjective standard for purposes of § 548(c), as was noted in *Perkins v. Lehman Bros., Inc. (In re Int'l Mgmt. Assocs., LLC)*, 563 B.R. 393, 419 n. 65 (Bankr. N.D. Ga. 2017) *reversed by Perkins v. Lehman Bros., Inc.*, No. 1:17-cv-0302-SCJ, at 4 (N.D. Ga. Feb. 12, 2018) (unpublished), it appears that the Eleventh Circuit may favor the objective approach.

norms, practices, sophistication, and experience generally possessed by participants in the transferee's industry or class." *Bayou Group*, 439 B.R. at 313; *Hackney*, 2014 WL 4059787 at *5 ("When analyzing what a business transferee should have known, courts take 'into consideration the customary practices of the industry in which the transferee operates.'") (quoting *Nieves*, 648 F.3d at 239-40).

This Court need not decide whether the objective or subjective approach is correct because under either standard the undisputed facts establish Defendant's good faith and Plaintiff's failure to adduce any contrary evidence that would create a question of material fact in response to Defendant's Motion. Considering the subjective approach first, in which the integrity, trust, and good conduct of Defendant is considered, the Court must analyze whether Defendant knew about TRS's or Simpson's intent to hinder, delay or defraud[26] creditors or insolvency. The Court has determined that Defendant is entitled to summary judgment on the issue of actual and constructive fraud with respect to TRS, such that there was no actual or constructive fraud for Defendant to know of.  As a result, under the subjective standard, Defendant necessarily acted in good faith with respect to TRS. Regarding Simpson, the Court cannot conclude that she did not intend to hinder or delay or defraud her creditors such that it could be possible that Defendant knew of her bad intent. However, Plaintiff concedes that Defendant did not have any actual knowledge of Simpson's insolvency or fraudulent intent.

---

[26] The actual test used by the bankruptcy court in *Meoli v. The Huntington National Bank (In re Teleservices Group, Inc.)* 444 B.R. 767 (Bankr. W.D. Mich. 2011), was "[d]id [defendant] ever reach the point where it could no longer legitimately cling to its belief that the Teleservices transfers were only Cyberco's collected receivables? If the answer is no, then [defendant] will have established its Section 550(b)(1) good faith. But if the answer is yes, then it is difficult to comprehend how [defendant] could have ever accepted any subsequent transfer from Teleservices without also suspecting with good reason that Teleservices was perpetrating a fraud upon its creditors." *Id.* at 818. As noted above, the Sixth Circuit found no error in this approach. *Meoli*, 848 F.3d at 734. While there is debate about whether a subjective or objective approach is appropriate, this formulation appears to this Court to be the same as the articulation of the objective test. *See eg: Sherman*, 67 F.3d at 1355.

[Def. SMF ¶¶ 71-73; Pl. Resp. ¶ 1]. Thus, Defendant acted in subjective good faith in selling tickets to Simpson as a matter of law.

Under the objective standard, the Court must consider whether the undisputed facts would or should have caused Defendant to know that the transfers were fraudulent or that the Debtors were insolvent. While Plaintiff concedes Defendant did not have actual knowledge of insolvency or fraudulent intent by the Debtors, he argues certain elements of the transactions raised red flags requiring further inquiry. In so arguing, Plaintiff points to the sheer number of transfers made to Defendant by both TRS and Simpson to pay for flights for the benefit of third parties, which he argues should have put Defendant on inquiry notice of the potential misuse of the credit and debit cards. Plaintiff further contends that a simple credit search would have alerted Defendant to the tax liens and judgment against Simpson, which would have then put Defendant on inquiry notice as to TRS and that this information would have led Defendant to discover further information as to TRS's precarious financial position.

Plaintiff cites to *Martinez v. American Express Travel Related Services Co., Inc.*, No. 06-61712, 2007 WL 1695339 (S.D. Fla. June 8, 2007), in support of his argument. Plaintiff contends that the court in *Martinez* succinctly dealt with American Express's argument that "because it processes over 600,000 payments on cardmember accounts, it would be impossible to check each payment to identify whether the payor is the same as the cardholder" by indicating Congress had addressed that concern by imposing temporal limits on avoidable transfers. *Id.* at *1, 2. In *Martinez*, a court-appointed receiver sought to recover as constructively fraudulent payments made by the debtor for charges on the personal credit card of the debtor's former vice president. *Id.* at *1. However, in *Martinez*, there was no dispute that the defendant acted in good faith. *Id.* Because the Florida law did not contain a good-faith defense for a claim of constructive

46

fraud, the defendant raised a "holder in due course" defense, which the court found did not apply to the defendant. *Id.* at *1-2. Therefore, *Martinez* is inapposite.

In evaluating whether the facts and circumstances surrounding the sales of tickets to the Debtors should have caused Defendant to inquire further about the financial condition of the Debtors or their intent in purchasing tickets, the Court must construe the facts in the light most favorable to Plaintiff.[27]  The undisputed facts establish the following: (1) the total cost of tickets issued between 2011 and 2015 to TRS or Simpson was $181,336; (2) four different cards were used to purchase the tickets; (3) the purchases were made by an authorized user of each of the debit and credit cards; (4) Defendant obtains an approval or denial code from the card issuer or processor at the time of sale; (5) the transaction approval code indicates that the card issuer or processor has confirmed the form of payment is acceptable and agrees to honor the transaction amount and remit same to Defendant; (6) Defendant's third party vendor Accertify reviews all direct ticket sales for potential fraud and never notified Defendant that any of the Debtors' debit or credit transactions were identified as or resolved as fraudulent; (7) all the ticket purchases were processed in the ordinary course of Defendant's business; (8) all the purchases were arm's length transactions; (9) Defendant implemented a number of policies and procedures to detect and deter potential fraud in credit card and debit card transactions. (10) corporations must purchase plane tickets in the name of the individual(s) flying; (11) third party payments are common at Defendant and other U.S.-based commercial airlines; (12) at no time has Defendant been notified by the respective card issuer or processor that any of the debit or credit transactions were unauthorized or disputed; (13) Defendant relied solely on the approval codes issued by the card issuers and processors to receive payments for the Debtors' ticket purchases; (14) a third

---

[27] Given that Defendant bears the burden on good faith and that Defendant's Motion, unlike Plaintiff's Motion, covers all the transfers in the Complaint, Plaintiff is the nonmoving party in this analysis.

party payment is generally not an indicator of credit card or debit card fraud; and (15) Defendant's fraud mitigation policies and procedures, as well as those established at other U.S.-based commercial airlines, are not intended to detect instances where a company employee improperly uses corporate funds in violation of corporate governing documents, employee policies, or applicable law.

In the face of these undisputed facts, Plaintiff must point to evidence in the record that would create an issue of fact that would allow the Court to reasonably infer that Defendant should have inquired into Debtors' solvency or intent. Instead of pointing to such record evidence, Plaintiff has argued that there are red flags in the transactions but has failed to explain why the purchase of tickets for third parties, which he does not dispute is common in the industry, should raise a red flag that would require Defendant to conduct a credit check on Simpson especially when Defendant has not extended any credit to Simpson or TRS. Nor does Plaintiff explain why the check of Simpson's credit should create any duty to inquire into the separate entity of TRS. Plaintiff's argument that the sheer number of third-party tickets purchased created a duty to inquire is inconsistent with the undisputed facts regarding the purchase and use of third party tickets in the U.S. airline industry. This remains true even though U.S.-based commercial airlines' policies seek to protect against credit and debit card fraud and do not detect potential misuse by an authorized user of a debit or credit card.  Considering the facts and circumstances in this case on an objective basis, this fact alone, does not raise create a duty to inquire and there is no genuine issue of material fact regarding Defendant's good faith.

Because the Court finds Defendant gave value equal to the amount paid for each of the tickets and acted in good faith, Defendant has a complete defense to all Plaintiff's claims under 11 U.S.C. § 548(a) and a complete defense to all Plaintiff's claims for actual fraudulent

transfer under O.C.G.A. § 18-2-74(a)(1). To the extent any of the transfers are avoidable under O.C.G.A. § 18-2-74(a)(2) or § 18-2-75, Defendant has shown the tickets were purchased for fair market value and it acted in good faith. Therefore, Defendant's liability for the transfers is $0. O.C.G.A. § 18-2-78(d)(3). .Based on the foregoing, Defendant is entitled to summary judgment on Counts 1 through 4 of the Complaint.

### B. Recovery Under § 550

When a trustee has avoided a transfer, 11 U.S.C. § 550(a) allows him to recover the property transferred or its value from the initial transferee or a subsequent transferee. However, the trustee cannot recover from a subsequent transferee who took in good faith. *Id.* § 550(b). The parties disagree about whether Defendant is an initial transferee or a good-faith subsequent transferee. The question hinges on whether the financial institutions that issued the debit and credit cards were transferees or mere conduits. *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1324 (11th Cir. 2010). The Court has determined that none of the transfers are avoidable under § 548 or O.C.G.A. § 18-2-74(a)(1) because Defendant has proven it took the transfers in good faith for value. Furthermore, Defendant has proven it is not liable for transfers under O.C.G.A. § 18-2-74(a)(2) or 18-2-75 because it took in good faith for value. Therefore, Plaintiff cannot recover from Defendant under § 550(a).

### C. Unjust Enrichment

"Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Sitterli v. Csachi*, 344 Ga. App. 671, 673, 811 S.E.2d 454, 457 (2018) (quotation marks and citations omitted). Thus, Plaintiff must establish that Debtors and

Defendant did not have a contract, Debtors conferred a benefit on Defendant, Defendant voluntarily accepted and retained that benefit, and the circumstances are such that Defendant's retention of that benefit without paying the value thereof would be inequitable. *See Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012).

Here, there is no evidence that the parties had a contract governing TRS's or Simpson's purchase of airline tickets, although a contract may have arisen upon the purchase of the tickets. There is no dispute the Debtors conferred a benefit on Defendant by paying for the airline tickets at issue and that Defendant accepted the payment. There is no dispute that the Debtors paid fair market value for the tickets. It is further undisputed that Defendant fully performed its obligations by providing air transportation upon presentment of the tickets. Therefore, Defendant's retention of payment is not inequitable. Accordingly, the Court finds Defendant is entitled to summary judgment on Count 5 of the Complaint.

## VI. Conclusion

Plaintiff has failed to make a prima facie case for fraudulent transfer under § 548 or § 544 and O.C.G.A. § 18-2-74, -75. Plaintiff further has failed to show he is entitled to judgment as a matter of law on the issue of unjust enrichment. Defendant has shown it received the transfers at issue in good faith and for value. Accordingly, it has established a defense to all Plaintiff's claims for fraudulent transfer either as to avoidance or liability, and is entitled to summary judgment on Counts 1, 2, 3, and 4 of the Complaint. Defendant has also shown that Plaintiff is unable to make a prima facie case for unjust enrichment and that Defendant is entitled to summary judgment on Count 5 of the Complaint. For the foregoing reasons, it is

ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED; it is further

ORDERED that Defendant's Motion for Summary Judgment is GRANTED as to all counts of the Complaint.

**END OF ORDER**

**Distribution List**

Robert A. Bartlett
Ragsdale, Beals, Seigler, et al
2400 Int'l Tower Peachtree Center
229 Peachtree Street, NE
Atlanta, GA 30303-1629

William Russell Patterson, Jr.
Ragsdale Beals Seigler Patterson & Gray
2400 International Tower
229 Peachtree Street NE
Atlanta, GA 30303-1629

Harris Bryan Winsberg
Troutman Sanders, LLP
600 Peachtree Street, NE
Suite 3000
Atlanta, GA 30308

Matthew R. Brooks
Troutman Sanders LLP
Suite 3000
600 Peachtree Street, NE
Atlanta, GA 30308

Meghan J. Wells
Troutman Sanders LLP
Suite 3000
600 Peachtree Street, NE
Atlanta, GA 30308-2216

Robert Trauner
P.O. Box 421025
Atlanta, GA 30342